IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| TOCARRA HOLLINSHEAD | ) | Case No: 2:19-cv-2517-RMG-BM |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | (Title VII & 42 USC §1981) |
| vs. | ) | |
| | ) | (Racial Harassment & Discrimination) |
| THE MEDICAL UNIVERSITY OF SOUTH CAROLINA | ) | (Sexual Harassment & Discrimination) |
| | ) | |
| Defendant. | ) | (Trial by Jury) |

COMES NOW, the above-named Plaintiff, who complaining of the Defendant will show unto this honorable Court as follows:

**PARTIES, JURISDICTION, & VENUE**

1. Plaintiff is a citizen of the United States and at the times relevant to the allegations made herein was a resident of Dorchester County, South Carolina.

2. Defendant, the Medical University of South Carolina (hereinafter "MUSC"), is a non-profit entity organized and existing under the laws of the State of South Carolina and operating through a principal place of business in Charleston County, South Carolina.

3. At the times relevant to this action, Plaintiff was employed by MUSC in Charleston County, South Carolina, and the allegations of this Complaint relate to that employment and include that MUSC violated, *inter alia,* Title VII of the Civil Rights Act of 1964 (as amended 42 U.S.C. § 2000 et. seq.) and 42 U.S.C §1981.

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343, and 42 U.S.C. § 2000(e)(5), together with supplemental

jurisdiction over any state court claims which may be alleged, and further has jurisdiction over the parties.

5. Venue is proper in the Charleston Division pursuant to 28 U.S.C. §1391(b) because the acts complained of occurred in Charleston County and this is further where MUSC conducts business and may be found.

## PREREQUISITES

6. Plaintiff is an African American female, and as such is a member of a protected group.

7. Plaintiff has exhausted all administrative remedies and conditions precedent to the instant action.

8. MUSC employees fifteen (15) or more employees and is therefore an "employer" as defined by Title VII of the Civil Rights Act of 1964 (the "Act").

9. As a result of the discriminatory conduct described herein Plaintiff filed a timely a complaint with the Equal Employment Opportunity Commission ("EEOC"), and on June 11, 2019, the EEOC issued a Notice of Right to Sue.

10. This action is filed within ninety (90) days of the Notice of Right to Sue.

## FACTUAL ALLEGATIONS

11. Upon information and belief, MUSC employs in excess of five hundred people.

12. Plaintiff began her employment with MUSC in or around 2007.

13. In October of 2017, Plaintiff was hired to work in the Finance Department of the Clinical Trials Office at the Hollings Cancer Center, a division of MUSC located in the Harborview Tower (the "Finance Department").

14. Plaintiff was hired by "Terri Wall[1]" as a "grants assistant."

15. Wall was Plaintiff's supervisor and the director of the Finance Department.

16. Plaintiff, along with Wall, and up to three other employees of the Finance Department shared a single room which functioned as communal office.

17. When Plaintiff started her position with the Finance Department, she took over the duties of "Jane Doe"[2] who had been temporally filling the role of grants assistant.

18. Upon information and belief, Jane Doe was reassigned to her normal role within the Finance Department when Plaintiff was hired, and Jane Doe continued to work in the same communal office with Plaintiff and Wall.

19. Although MUSC told Plaintiff it would provide her with job training, Plaintiff was ultimately provided very little training.

20. Upon starting her position in the Finance Department, Plaintiff began to overhear Walls's telephone conversations regarding her personal "love life" and "sex life." Wall made no attempt to keep these private, and often explicit, conversations quiet in the open communal office.

21. Almost immediately Wall began, without prompting or invitation, to solicit Plaintiff's thoughts and advice on the status of Wall's love life, including how Wall should manage a self-described affair she claimed to be having with a man who was reportedly married/living with another woman.

22. Plaintiff found these conversations to be inappropriate and was insulted by the implication that she had advice to offer on juggling multi-party sexual relationships.

23. Plaintiff told Wall that these open conversations and discussions about Wall's relationships and sexual activities made Plaintiff uncomfortable and were offensive.

---

[1] This is the name by which Ms. Wall was known to Plaintiff.

[2] A pseudonym

3

24. Plaintiff's complaints about these inappropriate conversation topics resulted in Wall dubbing Plaintiff "Miss Goody Two-Shoes" and sparked yet further jokes from Wall about what she perceived to be Plaintiff's modesty.

25. Wall made discriminatory comments about Plaintiff's religion as a Pentecostal Christian and made jokes about stereotypes of how African Americans behaved in church.

26. Wall acted out impersonations of African American churchgoers by jumping around, flailing her arms, pretending to faint and other similar activity.

27. Wall's racial harassment escalated from comments about Plaintiff's "nappy hair" or her "weave" to Wall imitating stereotypes of African American dialects.

28. Wall's insults and impersonations were offered in the nature of a Vaudeville-like caricature of African American women and included Wall telling Plaintiff to perform for her "like y'all do" (or words to that effect). Plaintiff refused such indignity.

29. Wall would mockingly and rhetorically ask Plaintiff "am I offending you?" and would often accompany her racist commentary with a false apology by saying: "Sorry not sorry!"

30. On one occasion Wall bragged that she had learned a former employee of the Finance Department, who had moved to another department at MUSC, was afraid to be in the same room with her. Wall referred to this former employee, who is of Asian heritage, as a "Chink-a-Chong," and explained the only reason the employee was allowed a transfer to another job within MUSC was because her husband was a doctor.

31. On another occasion, Wall recounted past interactions with African Americans to assert her claim that African Americans aspired to intimidate white people, and therefore as a white person Wall boasted that she found it necessary to turn the tables by intimidating African Americans.

32. In this, Wall succeeded.

33. Wall's harassment was also accompanied by unwanted and inappropriate touching of Plaintiff. In one instance Wall rapped Plaintiff on the head with a ruler while commenting "that's how you [i.e., black women] have to scratch your head." This was accompanied by Wall's commentary on observations of African American women who pat rather than scratch their heads to avoid unbraiding their hair.

34. More than once Wall performed a dance commonly referred to as "twerking" which involved Wall gyrating and rubbing her buttocks against Plaintiff.

35. On one such occasion, Wall went so far as to lift her skirt above her waist while rubbing her buttocks against Plaintiff in a provocative manner. Plaintiff was sitting at her desk and was unable to move away or avoid this physical contact due to the layout of the communal office space.

36. As time passed, Plaintiff became concerned that the work performed by her predecessor, Jane Doe, was in such a poor state that it could result in potential mistakes that would reflect poorly on the entire Finance Department, including Wall. Plaintiff reported these concerns to Wall and asked about job training opportunities.

37. After voicing these concerns, Wall informed Plaintiff that, in lieu of job training, Plaintiff would have to appear before a "review committee."

38. Upon information and belief, Wall selected certain files that Plaintiff was working on to be reviewed by the committee, and Wall attended this review meeting with Plaintiff where, upon information and belief, the committee found no problems with Plaintiff's work.

39. After the review committee meeting adjourned Wall was noticeably angry and her actions toward Plaintiff became more hostile, and Wall further informed Plaintiff's co-workers that Plaintiff made more money than them, seemingly to foster disdain for Plaintiff among her co-workers.

40. As a result of this, Plaintiff resolved to report this conduct to MUSC's Human Resources (sometimes "HR"). However, on her first visit to the HR office, the only representative available to speak with was someone Plaintiff believed to be personal friends with Wall.

41. Wall's pattern of harassing and embarrassing Plaintiff continued. Wall made non-specific complaints about Plaintiff's work performance loudly in the communal office. However, when Plaintiff asked Wall about any specific problems with her work she was provided with no criticisms or feedback.

42. Instead, and after many months, Wall informed Plaintiff that she would receive the requested job training but that it would be conducted by her predecessor, Jane Doe—about whose work Plaintiff had already complained.

43. After this, Plaintiff returned to HR for a second time, but again found that the representative she hoped to meet with was unavailable. Thus, Plaintiff had no choice but to meet with the woman she believed to be Wall's friend.

44. During this meeting, Plaintiff reported Wall's racial and sexual harassment, and the hostile environment this created. After noting Plaintiff's complaints, the HR representative responded by stating the conduct Plaintiff described "sounded like Wall" (or words to this effect).

45. At the conclusion of the meeting, Plaintiff was informed that HR would meet with Wall.

46. Later, Plaintiff was called to a follow up meeting with HR at which time she was told that Wall admitted to "everything" that Plaintiff had reported.

47. In this follow up meeting Plaintiff was also told that Wall had attempted to fire Plaintiff in June but was instructed by HR that Plaintiff could not be fired without an appropriate reason. Upon information and belief, this was the basis for Wall orchestrating the June review committee hearing.

48. As a result, Plaintiff requested HR to allow her to either transfer and/or move out of the communal office where she worked under Wall. Both requests were denied.

49. Upon information and belief, other employees of the Finance Department had been granted similar requests for a transfer as the result of conflicts caused by Wall's inappropriate and/or hostile conduct.

50. Rather that seek to resolve the issues, the HR representative instructed Plaintiff to participate in the job training that Wall had arranged with Jane Doe—which was scheduled for three days.

51. On the first day, Plaintiff received training from Jane Doe. However, on the second day, Jane Doe inexplicably did not come to work. Therefore, in Jane Doe's absence, Wall declared "now I've got you!"

52. On what was to be the third day of the planned job training, Plaintiff arrived at work to learn that she was being terminated effective immediately and without explanation.

53. After nearly a decade of employment with MUSC, but only six months working under Wall, Plaintiff was terminated on July 12, 2017.

54. Plaintiff reported to HR to ask why she was being fired before she had the chance to complete her three-day training and was told there was nobody available to speak with her, but someone would call her.

55. Subsequently, Plaintiff received a phone call from the HR representative to whom she had made her complaints. In this phone call Plaintiff was told that MUSC would not "fight" her on getting unemployment benefits and was further instructed not to tell the unemployment office about the incidents with Wall or the complaints she made.

56. Upon information and belief, shortly after her termination the Plaintiff's job was filled by an individual of a non-protected class.

# FOR A FIRST CAUSE OF ACTION
## SEXUAL HARASSMENT and/or RACIAL HARASSMENT/HOSTILE ENVIRONMENT
## VIOLATION OF TITLE VII

57. Plaintiff incorporates and realleges the preceding paragraphs as if restated here.

58. At all relevant times, MUSC was an "employer" as defined by Title VII and is otherwise subject to the Act.

59. MUSC's conduct, by and through its agents, including Wall, was offensive to Plaintiff, unwelcomed, threatening, and inappropriate, and Plaintiff so advised MUSC.

60. MUSC's harassment and threats were based on Plaintiff's race and/or gender.

61. MUSC's conduct humiliated and intimidated Plaintiff, unreasonably interfered with her work performance, and adversely affected the terms, conditions, and privileges of her employment.

62. MUSC's conduct caused Plaintiff fear, emotional distress, anxiety, inconvenience, loss of enjoyment of life, embarrassment, and loss of professional standing.

63. MUSC's actions created an environment that a reasonable person would find hostile and abusive.

64. MUSC's conduct fostered and promoted an environment where such hostility and abusiveness could and did occur and continue.

65. The harassment occurred openly and regularly and MUSC had actual and/or constructive notice of this, and MUSC failed to take any action to stop this harassment or remedy the known hostile work environment.

66. MUSC's action and/or failure to take action foreseeably subjected Plaintiff to a barrage of escalating offenses which progressed from sexual innuendos and offensive jokes, to racial insults, and ultimately led to unwanted touching, assault, battery, and false imprisonment, all based on Plaintiff's race and/or gender in violation of Title VII.

67. As the direct and proximate result of MUSC's wrongful conduct, and the hostile and offensive environment MUSC created, Plaintiff has suffered damages *including* lost back and future wages, income, benefits, expenses of seeking other work, emotional distress, anxiety, inconvenience, loss of enjoyment of life, embarrassment, loss of professional standing, and is further entitled to recovery of attorney fees, costs, and pre-judgment interest.

68. MUSC's actions were intentional, willful, wanton, reckless, and/or malicious, and without regard for the protected rights of Plaintiff, and Plaintiff is therefore entitled to recover punitive damages.

**FOR A SECOND CAUSE OF ACTION**
RETALIATION IN VIOLATION OF TITLE VII

69. Plaintiff incorporates and realleges the preceding paragraphs as if restated here.

70. In addition to asking Wall to stop, Plaintiff reported the racial and sexual harassment she suffered to MUSC.

71. Plaintiff's making of these good faith objections and complaints was a protected act under Title VII.

72. In retaliation for taking this protected action, Plaintiff was denied job training without reasonable justification and/or was discharged without warning and for false and/or trivial reasons.

73. Prior to and at the time of her termination, Plaintiff performed her job duties in a manner consistent with MUSC's reasonable and legitimate expectations.

74. By denying Plaintiff job training and/or terminating Plaintiff for making complaints of harassment, MUSC violated 42 U.S.C. §2000.

75. As the direct and proximate result of MUSC's wrongful conduct, Plaintiff has suffered damages including lost back and future wages, income, benefits, expenses of seeking

other work, emotional distress, anxiety, inconvenience, loss of enjoyment of life, embarrassment, loss of professional standing, and is further entitled to recovery of attorney fees, costs, and pre-judgment interest.

76. MUSC's actions were intentional, willful, wanton, reckless, and/or malicious, and without regard for the protected rights of Plaintiff, and Plaintiff is therefore entitled to recover punitive damages.

**FOR A THIRD CAUSE OF ACTION**
TERMINATION and/or DENIAL OF TRAINING BASED ON RACE and/or SEX
IN VIOLATION OF TITLE VII

77. Plaintiff incorporates and realleges the preceding paragraphs as if restated here.

78. Prior to and at the time of her termination, Plaintiff performed her job duties in a manner consistent with MUSC's reasonable and legitimate expectations.

79. Plaintiff was subsequently discharged without warning and for false and/or trivial reasons on account of her race and/or sex.

80. Plaintiff was denied job training which demonstrates that any complaints about her performance were pretextual.

81. Upon information and belief, after Plaintiff's termination her position remained open and/or was filled by a person outside Plaintiff's protected group, and/or was accompanied by other circumstances as discovery may show inferring discrimination and/or discriminatory intent on the part of MUSC.

82. Plaintiff's non-African American coworkers who made similar complaints about Wall's conduct were treated more favorably. Upon information and belief, these non-African American coworkers were not disciplined or terminated but instead offered transfers to other employment with MUSC away from Wall.

83. MUSC terminated Plaintiff because of her race and/or sex in violation to Title VII.

84. As the direct and proximate result of MUSC's wrongful conduct, Plaintiff has suffered damages including lost back and future wages, income, benefits, expenses of seeking other work, emotional distress, anxiety, inconvenience, loss of enjoyment of life, embarrassment, loss of professional standing, and is further entitled to recovery of attorney fees, costs, and pre-judgment interest.

85. MUSC's actions were intentional, willful, wanton, reckless, and/or malicious, and without regard for the protected rights of Plaintiff, and Plaintiff is therefore entitled to the recovery of punitive damages.

**FOR A FOURTH CAUSE OF ACTION**
RETALIATION IN VIOLATION OF 42 U.S.C. §1981

86. Plaintiff incorporates and realleges the preceding paragraphs as if restated here.

87. Plaintiff and MUSC entered into an employment agreement and an agreement for MUSC to provide job training.

88. Plaintiff's good-faith complaints about the racial and sexual harassment and/or discrimination she suffered was a protected activity, and shortly thereafter in retaliation MUSC denied Plaintiff promised job training and/or discharged her without warning and for false and/or trivial reasons.

89. MUSC's intentional and retaliatory conduct violated 42 U.S.C. §1981.

90. As the direct and proximate result of MUSC's wrongful conduct, Plaintiff has suffered damages including lost back and future wages, income, benefits, expenses of seeking other work, emotional distress, anxiety, inconvenience, loss of enjoyment of life, embarrassment, loss of professional standing, and is further entitled to recovery of attorney fees, costs, and pre-judgment interest.

91. MUSC's actions were intentional, willful, wanton, reckless, and/or malicious, and without regard for the protected rights of Plaintiff, and Plaintiff is therefore entitled to recover punitive damages.

**FOR A FIFTH CAUSE OF ACTION**
DISCRIMINATION IN VIOLATION OF 42 U.S.C. §1981

92. Plaintiff incorporates and realleges the preceding paragraphs as if restated here.

93. Plaintiff and MUSC entered into an employment agreement and an agreement for MUSC to provide job training.

94. Prior to and at the time of her termination, Plaintiff preformed her job duties in manner consistent with MUSC's reasonable and legitimate expectations.

95. Plaintiff was discharged without warning and for false and/or trivial reasons.

96. MUSC's refusal to provide Plaintiff agreed upon job training demonstrates that any allegation by MUSC that Plaintiff's performance was lacking is merely pretextual.

97. MUSC's conduct contemporaneous to and after Plaintiff's termination as described herein demonstrates that MUSC's conduct toward Plaintiff was due to her race.

98. MUSC discrimination was intentional and violated 42 U.S.C. §1981.

99. As the direct and proximate result of MUSC's wrongful conduct Plaintiff has suffered damages including lost back and future wages, income, benefits, expenses of seeking other work, emotional distress, anxiety, inconvenience, loss of enjoyment of life, embarrassment, loss of professional standing, and is further entitled to recovery of attorney fees, costs, and pre-judgment interest.

100. MUSC's actions were intentional, willful, wanton, reckless, and/or malicious, and without regard for the protected rights of Plaintiff, and Plaintiff is therefore entitled to recover punitive damages.

WHEREFORE, Plaintiff prays this Court for the following:

A. That the matter be tried before a jury; and

B. That judgment be entered in favor of Plaintiff and against Defendant for all actual and special damages as the trier of fact may find, which is to include all lost back and future wages, income, benefits, expenses of seeking other work, emotional distress, anxiety, inconvenience, loss of enjoyment of life, embarrassment, loss of professional standing or other personal injury as the facts may show; and

C. That judgment be further entered against Defendant for Plaintiff's reasonable attorney fees, costs, and prejudgment interest in an amount to be established; and

D. That judgment be further entered against Defendant for punitive damages in an amount determined by the jury; and

E. That this Court grant all other relief it deems just, proper, and equitable.

THURMOND KIRCHNER & TIMBES, P.A.

By: s/ Thomas J. Rode
THOMAS J. RODE,
SC Bar No. 77480/Fed. Attorney I.D. No. 11139
15 Middle Atlantic Wharf
Charleston, South Carolina 29401
Phone: 843-937-8000
Fax: 843-937-4200
thomas@tktlawyers.com
*Attorneys for Plaintiff*